# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-109V

|   |   |
|---|---|
| SAMUEL MARTIN, | Chief Special Master Corcoran |
|                       Petitioner, |   |
| v. | Filed: April 21, 2025 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |   |
|                       Respondent. |   |

*Jimmy A. Zgheib, Zgheib Sayad, P.C., White Plains, NY,* for Petitioner.

*Madelyn Weeks, U.S. Department of Justice, Washington, DC,* for Respondent.

## FACT RULING REGARDING SEVERITY[1]

On February 3, 2022, Samuel Martin filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that as a result of an influenza ("flu") vaccine received on November 11, 2020, he suffered from a shoulder injury related to vaccine administration ("SIRVA") as defined on the Vaccine Injury Table (the "Table"). Pet., ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

A disputed fact issue has arisen regarding whether Petitioner's injury meets the Act's severity requirement. For the reasons discussed below, I find Petitioner suffered the residual effects of the injury for more than six months.

## I.  Relevant Procedural History

Respondent determined in the spring of 2023 that this matter was not appropriate for compensation, and thereafter filed his Rule 4(c) Report defending this case in June 2023. ECF No. 26. Respondent did not dispute that Petitioner has satisfied the criteria for a Table SIRVA claim. Rule 4(c) Report at 8. However, he maintained that Petitioner could not establish the Vaccine Act's threshold severity requirement, because there was not evidence of residual effects of the alleged injury for more than six months after the November 11, 2020 vaccination. *Id.* at 9 (internal citations omitted).

Respondent specifically pointed to a substantial, near eight-month temporal gap in the medical records during which Petitioner did not report ongoing symptoms. Rule 4(c) Report at 9. Respondent argued the record actually suggests that Petitioner's symptoms resolved a few weeks post-vaccination – supported by the fact that he had intervening medical visits without reporting continued shoulder pain during the gap in care. *Id.* More so, the medical records showed that Petitioner had an established pattern of seeking care when he needed it, and he continued receiving recommended vaccinations during the relevant gap *in the injured arm*. *Id.* at 9-10 (emphasis in original).

After a review of the record and Respondent's arguments, I issued an Order to Show Cause, outlining the critical issues related to Petitioner's ability to satisfy the statutory six-month severity requirement and affording him an opportunity to submit any additional evidence to remedy these deficiencies in the record. ECF No. 28. But I warned Petitioner that my ultimate severity analysis would start with the medical record documentation, supplemented by declarations or affidavits. *Id.* at 3-4.

In response, Petitioner submitted his own supplemental affidavit, along with affidavits from his wife and son. ECF No. 29. He also filed a Motion for a Ruling on the Record regarding severity. Motion, ECF No. 31. Respondent filed a Response supplementing his previous arguments and thus requesting dismissal. Response, ECF No. 32. Petitioner filed his Reply in March 2024. Reply, ECF No. 33. The issue of severity is now ripe for adjudication.

**II.     Contemporaneous Medical Records**

I have reviewed the entire record, including all medical records, affidavits or declarations, and additional evidence. Only those records related to severity will be discussed herein, however, although other facts may be included as necessary.

Petitioner's medical history is non-contributory. At age 66, during a visit with his primary care provider ("PCP") on November 11, 2020, he received the subject flu vaccine in his left deltoid. Ex. 2 at 3.

On November 24, 2020 (13 days post vaccination), Petitioner sent a message to his PCP stating that his left shoulder became "very painful after the flu shot" and that he "[n]ever had this kind of experience with a shot before." Ex. 6 at 1. He reported that it "seem[ed] like [his] joint is on fire" and that he had pain with movement. *Id.* Petitioner's PCP recommended warm packs and Advil "for the next few days and [the pain] should resolve." *Id.* at 2.

Petitioner again messaged his PCP the next month (on December 10, 2020), reporting that his "shoulder pain seem[ed] to be getting worse not better." Ex. 6 at 3. Specifically, "[u]sing heating pad and pain meds [sic] are not helping." *Id.* The PCP recommended Petitioner schedule an in-person examination. *Id.* at 4. On December 15, 2020, Petitioner sent another message to his PCP requesting a referral to a shoulder specialist. *Id.* at 5. Petitioner was told to schedule an appointment. *Id.* at 6.

The next day (December 16, 2020), Petitioner had a telemedicine visit with his PCP for complaints of "left shoulder pain that started a day after his flu shot (11/11/2020)." Ex. 4 at 96. He reported no improvement in his pain, but rather that it was "getting worse daily," and that it was "hard to do any motion without [his shoulder] hurting." *Id.* at 96-97. The PCP prescribed a Medrol dosepak and referred Petitioner to an orthopedist. *Id.* at 97.

On December 23, 2020, Petitioner saw an orthopedist complaining of shoulder pain that began "4 weeks ago [following a] flu injection." Ex. 5 at 9. Petitioner stated that the Medrol dosepak "ha[d] taken the pain from about [an] 8 to a 2, but it [was] still painful all the time." *Id.* He also described "limited motion secondary to pain." *Id.* A physical examination showed diminished ROM and positive impingement signs. *Id.* at 11. An x-ray performed during the orthopedic evaluation was consistent with "moderate glenohumeral joint and [acromioclavicular ("AC")] joint arthritis." *Id.*

The orthopedist's impression was "left shoulder pain following flu vaccine." Ex. 5 at 11. Specifically, the orthopedist noted that Petitioner experienced a "rare phenomenon"

of "post injection bursitis" wherein the needle "[p]otentially . . . penetrated into the subdeltoid and subacromial space." *Id.* The orthopedist felt that "the majority of time this is something we can treat conservatively without surgery." *Id.* For Petitioner, the treater "recommended a nonsteroidal anti-inflammatory meloxicam[,]" at-home rotator cuff strengthening exercises, and to return "in 4 weeks to see his progress." *Id.* If Petitioner was "still having issues or problems" following the course of treatment, the orthopedist recommended a possible steroid injection at that time. *Id.*

There is thereafter a lengthy gap in time during which Petitioner never obtained additional care for his injured shoulder. Yet he frequently obtained treatment during this period. For example, on January 7, 2021 (just two weeks after his initial orthopedic evaluation) Petitioner received a COVID-19 vaccination in his *left* deltoid – the purportedly-injured limb.[3] Ex. 5 at 33; Ex. 13 at 7 (emphasis added). Additionally, Petitioner saw his PCP on February 8, 2021, for a refill of his diabetes medication. Ex. 14 at 330-34. He did not describe left shoulder symptoms during this visit. *See id.*

Petitioner had several more intervening medical visits before he again attempted to address shoulder issues. For instance, on March 10, 2021, Petitioner saw his cardiologist for residual chest tenderness from a prior quadruple bypass surgery. Ex. 8 at 535-36. On April 16, 2021, Petitioner had a telemedicine visit with a nurse at his PCP's office "after getting popcorn stuck in his gums[,]" for which he was told to follow up with a dentist. Ex. 4 at 110. But the "active problem list" for this visit includes (among several other conditions) "bursitis of the left shoulder" with a "date noted" of "12/23/2020." *Id.* at 316. Petitioner underwent an exercise stress test (on recommendation from his cardiologist) on April 30, 2021; he visited his cardiologist to review the results on June 2, 2021. Ex. 8 at 489, 498.

More so, on June 14, 2021, Petitioner returned to his PCP for his annual wellness visit and Medicare Wellness Assessment. Ex. 4 at 122, 126. He mentioned chest tightness during this visit but did not complain of left shoulder symptoms. *See id.* Bursitis of the left shoulder was again listed among Petitioner's active problem list (from "12/23/2020 – present"). *Id.* at 119. As part of the Medicare Assessment, Petitioner noted that he engaged in "moderate to strenuous exercise such as walking fast, running, jogging, dancing, swimming, biking, or other activities that cause a light or heavy sweat" three days per week. *Id.* at 125.

On August 4, 2021 – now approximately seven-and-a-half months after his last visit for left shoulder complaints (on December 23, 2020) – Petitioner returned to his

---

[3] The record for this vaccination contains a computerized entry showing the site of vaccine administration as the "left deltoid." *See* Ex. 13 at 7; *see also* Ex. 16 at 40.

4


orthopedist, reporting that his left shoulder was "still giving him issues." Ex. 5 at 23. He stated that he "has been performing his exercises daily but still continues [to] have pain [and] discomfort that is deep inside his shoulder[;]" lifting and movement exacerbate his pain. *Id.* An examination showed tenderness to palpation, limited ROM, reduced strength, and positive impingement signs. *Id.* at 25. The orthopedist maintained his assessment of bursitis and noted that Petitioner had "continued pain and discomfort despite conservative treatment[;]" an MRI was ordered. *Id.*

Petitioner underwent an MRI on September 2nd and returned to his orthopedist to review the results on September 20, 2021. Ex. 5 at 38. The orthopedist felt that the MRI showed a "low-grade partial [thickness] rotator cuff tear" and "mild degenerative changes of the glenohumeral joint." *Id.* at 40. The treater opined that Petitioner's pain was coming from "a couple of areas" – in that "[w]hile he does have a low-grade partial rotator cuff tear[,] he does have some arthritis in the shoulder joint." *Id.* The orthopedist felt that there was no "cure" for the arthritis, but it was something to be treated "conservatively" with a steroid injection of the subacromial space, which Petitioner received. *Id.* He also received additional at-home exercises to strengthen his rotator cuff. *Id.*

During Petitioner's November 1, 2021 orthopedic follow up, the orthopedist reiterated the view that Petitioner's "pain is coming from a combination of his arthritis and possibly partial rotator cuff tear." Ex. 5 at 55. The orthopedist noted, however, that Petitioner was "more convinced that [it] is more the partial rotator cuff tear." *Id.* at 56. The orthopedist proposed surgery as the next step. *Id.*

By January 11, 2022, Petitioner decided to proceed with surgery because "he continue[d to] have pain [and] discomfort" despite exercises and medication. Ex. 5 at 84-85. Petitioner underwent a left shoulder arthroscopic debridement of the partial rotator cuff tear, subacromial decompression, and a distal clavicle resection on May 23, 2022. Ex. 9 at 92-93. Both the pre- and post-operative diagnoses were listed as a partial rotator cuff tear, impingement, bursitis, and AC joint arthritis of the left shoulder. *Id.* at 92. The operative note also contained Petitioner's history of "insidiously developing left shoulder pain" and that he had "undergone conservative treatment" with "continued [] pain and weakness." Ex. 10 at 169.

Petitioner thereafter attended post-operative physical therapy ("PT") from June 8, 2022 through August 3, 2022. *See generally* Ex. 12. During his evaluation on June 8, 2022, Petitioner stated that he "had a vaccination injury in November or December 2021 [sic]" and that the "needle punctured his tendon and rotator cuff." *Id.* at 79. He visited his orthopedist for follow ups through the fall of 2022. *See id.* at 1-78; *see also* Ex. 10 at 147-49; Ex. 18 at 8-10. No other medical record evidence bearing on severity has been filed.

### III.     Affidavits and Other Evidence

Through affidavits or declarations, Petitioner maintains that he can establish the Act's six-month requirement. In his original declaration (submitted at the initiation of this claim), Petitioner recalled that "[o]ver the next few months" after his December 23, 2020 orthopedic visit (the last visit before the gap in treatment), he "followed the recommended daily at-home shoulder strengthening exercises, took over-the-counter ibuprofen, and applied heat to [his] shoulder all without meaningful improvement." Ex. 3 ¶ 10.

In his supplemental affidavit (drafted in January 2024 *after* Respondent questioned evidence of six-months sequelae and my Order to Show Cause), Petitioner attested that he performed his at-home shoulder exercises "almost every day" from December 23, 2020, to August 4, 2021, but continued to have severe pain and ROM limitations. Ex. 20 ¶ 9. He stated that he followed the orthopedist's "exact instructions" from "December 2020/January 2021 to August 2021" *Id.* ¶ 16. Petitioner maintained that he "did not notice any improvement in [his] shoulder symptoms at all during the first six months of this injury," and, more so, "did not have any improvement, despite [his] steroid injection[.]" *Id.*

Additionally, Petitioner asserted that *several* of his medical records are missing entries or are otherwise incorrect. For instance, he stated that "[a]lthough there doesn't appear to be any records of it, [he] distinctly recall[ed] returning to [his orthopedist] about four weeks after [his] initial evaluation" on December 23, 2020. Ex. 20 ¶ 8. According to Petitioner, his orthopedist told him at that time to "continue daily home exercises . . . and to give it time to heal on its own." *Id.* Also according to Petitioner, the orthopedist told him during that visit to "get an MRI . . . if it does not get better with time." *Id.*

More so, he contended that during his February 8, 2021 PCP visit (for a refill of his diabetes medication), he "ask[ed] the nurse to use [his] right arm to check [his] blood pressure because of the pain in [his] left shoulder." Ex. 20 ¶ 11. According to Petitioner, he also "had a lengthy discussion" with his PCP concerning his persistent pain, for which the PCP told Petitioner to follow the instructions of his orthopedist. *Id.* There is no evidence of this discussion or complaints of left shoulder pain in the records for this visit.

Petitioner likewise argued that he discussed his ongoing left shoulder pain during his April 16, 2021 telehealth visit for popcorn in his gums. Ex. 20 ¶ 13. According to Petitioner, he told his PCP that his shoulder was "not doing any better despite doing daily home exercises." *Id.* But Petitioner admitted that this "discussion was ancillary to [his] gum pain" and he therefore did not receive "any treatment for [his] left shoulder at this visit." *Id.*

Similarly, Petitioner asserted that he described ongoing pain during his June 14, 2021 PCP visit. Ex. 20 ¶ 14. And, that the entry stating he engaged in moderate to strenuous exercise three days per week "is not accurate" and he is "not sure why this is in [his] medical records." *Id.* Specifically, Petitioner argued there was "obviously some misunderstanding about [his] walking exercise during the week" and Petitioner does "not engage in any other routine exercise" due to his unrelated ailments. *Id.*

Finally, Petitioner addressed his receipt of COVID-19 vaccinations in January 2021 (during the relevant gap in treatment). Despite evidence to the contrary, Petitioner attested that "[t]he January 7 vaccine was administered in [his] *right* shoulder." Ex. 20 ¶ 10 (emphasis added). He stated that "[a]lthough they wanted to administer [the vaccination] in [his] left shoulder, [he] refused and insisted that they administer it in [his] right shoulder because of the injury to [his] left shoulder." *Id.*

Petitioner's wife submitted an affidavit in response to my Order to Show Cause. She attested, in relevant part, that Petitioner's "left shoulder pain and soreness persisted from December 2020 to August 2021" and that he "did not have any improvement at all in his condition during this time." Ex. 21 ¶ 8. Rather, Petitioner "did regular home exercises" and she helped him with activities of daily living. *Id.* ¶¶ 8-9. Petitioner's wife attested that, "to this day," Petitioner has slept on an inclined reading pillow every night "[s]ince the November 11, 2020 vaccination" – including during the gap in care. *Id.* ¶¶ 3, 8. And, she recalled Petitioner telling her that they wanted to administer Petitioner's January 7, 2021 COVID-19 vaccine in his left arm but he refused. *Id.* ¶ 6. She also described "[o]ne day in the spring of 2021," when she and Petitioner went to a drive through bank and Petitioner was unable to reach out of the car window due to his shoulder pain. *Id.* ¶ 7.

Additionally, Petitioner's wife addressed entries in Petitioner's records. She explained that during the period from March to June 2021 (when Petitioner sought care for cardiac-related concerns), he still experienced shoulder pain and dysfunction. Ex. 21 ¶ 9. She characterized Petitioner's June 14, 2021 record noting he engaged in strenuous exercise causing a sweat as "an error." *Id.* ¶ 10. She explained that Petitioner "occasionally goes for normal-paced walks" but had never "intently engaged in such activities for as long as [she has] known him" (50+ years). *Id.* Petitioner's wife stated that "[i]t is possible the medical records mischaracterize his level of activity because if he is outside walking in June . . . it's possible that" he may sweat. *Id.*

Petitioner's son also authored an affidavit following my Order to Show Cause. He described two events in January 2021, during which he witnessed Petitioner attempting to reach overhead but instead winced in pain and grabbed at his left shoulder. Ex. 22 ¶¶

7

5-6. Then, in March 2021, Petitioner's son received a replacement computer and recalled Petitioner not being able to help install it as a result of his shoulder pain. *Id.* ¶ 8. He specifically remembered dinners with Petitioner on April 10, 2021, May 10, 2021, and June 21, 2021 (for birthdays or holidays), when Petitioner would wince in pain when trying to bring dishes to the kitchen or reach for a glass. *Id.* ¶¶ 9-10. He attested to Petitioner's worsening shoulder pain from December 2020 to August 2021, including that "during the winter" Petitioner would put on his coat very slowly and in a particular manner to avoid aggravating his shoulder. *Id.* ¶¶ 7, 11.

Also, at the claim's initiation Petitioner filed a copy of the retainer agreement between himself and counsel. *See generally* Ex. 7. The agreement was executed on October 1, 2021. *See id.* at 1, 3. In response to my Order to Show Cause, Petitioner submitted evidence of an email communication with counsel dated May 24, 2021. *See generally* Ex. 19. The email showed Petitioner's inquiry to counsel regarding the previously-proposed changes to the SIRVA Table criteria, followed by counsel asking Petitioner if he still had pain in his shoulder from the flu shot. *Id.* at 1. Petitioner responded by stating "[y]es, first trip did x-ray. Said I have inflammation. Still hurts 6mo [sic] later. Going back for MRI." *Id.* The email also showed what appears to have been a communication between Petitioner and counsel dated January 10, 2021 – however, the content of the email is not contained in the produced exhibit (simply the date and time). *See id.* No other affidavit or supporting evidence regarding severity has been filed.

## IV.    Applicable Legal Standard

Petitioners carry the burden of establishing the matters required in the petition by a preponderance of the evidence. Section 13(a)(1)(A). One such requirement is "documentation demonstrating that [the petitioner][4] . . . suffered the residual effects or complications of such [vaccine-related] illness, disability, injury, or condition for more than 6 months after the administration of the vaccine." Section 11(c)(1)(D)(i); *see also Black v. Sec'y of Health & Hum. Servs.*, 33 Fed. Cl. 546, 550 (1995) (reasoning that the "potential petitioner" must not only make a *prima facie* case, but clear a jurisdictional threshold, by "submitting supporting documentation which reasonably demonstrates that a special master has jurisdiction to hear the merits of the case"), *aff'd*, 93 F.3d 781 (Fed. Cir. 1996) (internal citations omitted).

The Act prohibits finding a petition requirement "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." Section 13(a)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment,

---

[4] Or other vaccinee, e.g., a minor or other person who is unable to represent his or her own interests, on behalf of whom the claim is brought.

8

test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). This is because medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.* Patients may not report every ailment they are experiencing. *Id.*

Indeed, medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

The Vaccine Rules afford the special master discretion in choosing whether to hold a hearing, stating that he or she "may decide a case on the basis of written filings without an evidentiary hearing." *See* Vaccine Rule 8(d); *see also Kreizenbeck v. Sec'y of Health & Hum. Servs.,* 945 F.3d 1362 (Fed. Cir. 2020) (holding that the special master did not

abuse his discretion by resolving the claim on the written record without the petitioners' consent).

V.      Analysis

It is undisputed that Petitioner received the subject flu vaccine on November 11, 2020, and that the onset of his symptoms occurred within 48 hours of vaccination (at the latest). *See,* e.g., Rule 4(c) Report at 8. He therefore must demonstrate by preponderant evidence that his residual symptoms continued for more than six months thereafter from onset, or through May 11, 2021.

Despite the substantial near eight-month gap in shoulder-related treatment in this case (from December 23, 2020 to August 4, 2021), I find that the severity requirement has been *just barely* met in Petitioner's favor (although the facts of this case strongly establish a mild injury – and that not all post-vaccination concerns are compensable).

Most persuasive is the fact that Petitioner's August 4, 2021 orthopedic treatment records provide *some* – albeit minimal – evidence of continuing shoulder pain during the gap in treatment. Ex. 5 at 23. For instance, the purpose of this visit (and his later November 1, 2021 visit), was listed as "follow-up left shoulder pain." *See id.* at 23, 55. And, during this visit, Petitioner reported his shoulder was "*still* giving him issues" despite "performing his exercises *daily*" – per his orthopedist's recommendation. *Id.* at 23-24 (emphasis added). The fact that this entry appears in the *first* post-gap visit provides some support for six-months severity, even though the entry does not attribute his ongoing pain to the vaccination specifically.

More so, I find the entries in Petitioner's medical records during the gap from April 16 and June 14, 2021 (reflecting left shoulder bursitis as an "active" problem from "12/23/2020 – present") add additional support for a favorable severity finding. Ex. 4 at 119, 316. In fact, these entries corroborate (to some degree) Petitioner's assertions in his supplemental, post-Order to Show Cause affidavit and Motion that he engaged in "off-the-record conversations" with his providers regarding ongoing pain during the gap but that such complaints were not recorded because they were "ancillary" conversations to his primary ailments. *See,* e.g., Ex. 20 ¶ 13; Motion at 12.

As the Federal Circuit has determined, medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Kirby*, 997 F.3d at 1383. This appears to have likely been the case here, as it is reasonable, for example, that Petitioner's shoulder complaints were not recorded during his April 16th visit with a nurse at his PCP's office for getting popcorn stuck in his gums. Similarly, Petitioner's other intervening cardiac-related visits (from March – June 2021,

Ex. 8 at 489, 498, 535-36) do not detract from Petitioner's ability to establish six-months severity, as such visits were with a specialist from whom it would be unlikely for Petitioner to have received musculoskeletal care.

Moreover, I balance the absence of record evidence showing shoulder treatment after December 23, 2020, and before August 4, 2021, with the equal absence of evidence that the injury had likely fully resolved. *Compare* Ex. 5 at 9-11 (Petitioner's December 23, 2020 reports of improved pain with Medrol (from an 8/10 to a 2/10) but pain present "all the time"; the orthopedist recommended a nonsteroidal anti-inflammatory, at-home rotator cuff strength exercises, and to return in four weeks to see his progress, at which time a steroid injection could be necessary), *with* Ex. 5 at 23 (Petitioner's August 4, 2021 report that his left shoulder was "still giving him issues" despite "performing his exercises daily" and the orthopedist's note that he had "continued pain and discomfort despite conservative treatment"). Such entries in the medical records, taken together, provide sufficient evidence of six-months sequelae – albeit barely.

I must note, however, that I am not much relying on Petitioner's supplemental affidavits (including his wife's and son's) in resolving severity. Such affidavits were drafted following my Order to Show Cause, in direct support of litigation speaking to the critical issues previously outlined, and approximately four years post-vaccination. Judicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory. *Reusser v. Sec'y of Health & Hum. Servs.,* 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *Mueller v. Sec'y of Health & Hum. Servs.,* No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) ("Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate."); *Thelen v. Sec'y of Health and Hum. Servs.,* No. 90-22V, 1991 WL 38084, at *11 (Fed. Cl. Spec. Mstr. Mar. 6, 1991) (stating that the pressures of litigation may affect memory).

More than that, Petitioner's supplemental affidavit is inconsistent with his contemporaneous medical records on several points. For instance, Petitioner claimed (and his wife reiterated) that he did not experience relief or improvement in symptoms "*at all*" during the first six months of his injury. Ex. 20 ¶ 16; Ex. 21 ¶ 8 (emphasis added). However, during Petitioner's December 23, 2020 orthopedic visit – just six weeks post vaccination, Petitioner admitted that he experienced some improvement of his symptoms (rated from an 8/10 to a 2/10) after his course of Medrol. Ex. 5 at 9-11. Also, Petitioner's assertion that he attended an orthopedic follow-up visit approximately four weeks after his December 2020 visit but that it was not included in the records is not credible. Ex. 20 ¶ 8. Given the abundant records depicting Petitioner's post-vaccination care, it is unlikely

that an entire visit was omitted from the records, as alleged. Still to the extent Petitioner's assertions *are* supported by the contemporaneous medical records to some degree, (e.g., that some entries omitted conversations) I afford them appropriate weight.

Additionally, while the record supports Respondent's argument that Petitioner had contact with counsel as early as December 2020 or January 2021 at the latest (e.g., Reply at 3; Ex. 19 at 1), I do not find this fact to completely undermine the credibility of Petitioner's post-gap reports to treaters replied upon *in this case*. It is true that special masters have afforded less weight to statements made to treating physicians when made in the context of litigation, or those made after a petitioner began to suspect she might have a Program claim. *See,* e.g., *Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (affording little weight to a statement made after a 17-month gap in treatment, where the petitioner told the treater the return to care was at the direction of the lawyer); *Duda v. Sec'y of Health & Hum. Servs.,* No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters). But this does not mean *every* petitioner who knows of the Program's existence or has a potential vaccine claim is inherently not credible. *See Buck v. Sec'y of Health & Hum. Servs.,* No. 19-1301V, 2023 WL 6213423, at *8 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (failing to "dismiss the possibility that a petitioner *could* be incentivized to exaggerate their injuries by the prospect of monetary gain, [but noting] that does not mean that every petitioner who knows the Program exists is not credible"). Rather, the specific factual circumstances must be considered.

In *Buck*, for example, (a case involving an onset dispute), some of the relevant evidence of immediate onset of pain coincided with the petitioner's knowledge of the existence of the Vaccine Program. *See* 2023 WL 6213423, at *8 (a social media post describing immediate pain but that she was comforted by the existence of the Program and would possibly join a class action lawsuit). Still, as the *Buck* petitioner's reports to medical providers were consistent and relied on in providing care, it suggested that her providers thought she was credible. *Id.* Like the *Buck* petitioner, Petitioner's post-gap complaints to his orthopedist (beginning in August 2021 and thereafter) were consistent to his pre-gap complaints (in terms of symptomology[5] and that he had "continued" pain) and were ultimately deemed worthy of being relied upon for providing additional treatment. Thus, (contrary to Respondent's argument), despite the fact that Petitioner was in contact with counsel before returning to care does not undermine his post-gap reports to treaters.

---

[5] Both pre- and post-gap in treatment, Petitioner described shoulder pain which was exacerbated by movement, limited ROM, and he exhibited congruent results on examination – including positive impingement signs. Ex. 5 at 9-11, 23.

12

Likewise, Respondent's argument that Petitioner's receipt of a COVID-19 vaccination in his left arm undermines severity is also uncompelling. The vaccination record for this dose of the vaccine reflects a computerized "left deltoid" entry, and computerized entries have notoriously been given less weight in the Program. *See,* e.g., *Rizvi v. Sec'y of Health & Hum. Servs.*, No. 21-881V, 2022 WL 2284311, at *4-5 (Fed. Cl. Spec. Mstr. May 13, 2022) (routinely giving greater weight to vaccination records that are handwritten – meaning those that require specific action on the part of the vaccine administrator, as opposed to those that are automatically generated by a computerized system); *Rodgers v. Sec'y of Health & Hum. Servs.*, No. 18-0559V, 2020 WL 1870268, at *5 (Fed. Cl. Spec. Mstr. Mar. 11, 2020).

In addition, Petitioner's assertions that he refused the shot in his left arm and instead received it in the right arm is somewhat corroborated by his vaccination record. Ex. 20 ¶ 10. For instance, Petitioner's complete vaccination record appears to show that Petitioner received *numerous* subsequent vaccinations (from January 2021 to November 2022) in the right, non-injured arm. *See* Ex. 16 at 40-41; *see also* Motion at 13. Thus, I do not find Petitioner's receipt of the COVID-19 vaccination during the gap in care to preclude Petitioner from establishing the Act's severity requirement, as it was likely administered in the right arm, as alleged.

Overall, the circumstances in this case produce an extremely close call. Such circumstances produce at worst a "tie" in evidence that should go to Petitioner. *Roberts v. Sec'y of Health & Hum. Servs.*, No. 09-427V, 2013 WL 5314698, at *10 (Fed. Cl. Spec. Mstr. Aug. 29, 2013) (noting "[p]etitioners are accorded the benefit of close calls" in the Vaccine Program).

Although I have found that Petitioner can meet the Act's threshold requirement (albeit barely), I must note that to the extent Petitioner's injury continued after December 23, 2020, and during the gap in care, it must be viewed as extremely mild. I also note that Petitioner's post-gap treatment (and in particular his fall 2021 orthopedic evaluations, Ex. 5 at 55-56) suggest that most – if not all – of his later symptoms were primarily attributable to non-SIRVA issues, like a preexisting rotator cuff tear (which *could not be caused by vaccine administration*) or arthritis. *See,* e.g., *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (finding that evidence of the existence of a rotator cuff tear does not *per se* preclude a finding that a Table SIRVA exists, but the "key questions is whether [the] petitioner's own clinical history indicates that [his] shoulder pathology wholly explains [his] symptoms independent of

vaccination.")[6]; *Peka v. Sec'y of Health & Hum. Servs.,* No. 20-1099V, 2025 WL 551367, at *6 (Fed. Cl. Spec. Mstr. Jan. 15, 2025) (finding that a petitioner's upcoming shoulder surgery to treat bursitis *and* an age-related rotator cuff tear was not consistent with an ongoing vaccine-related injury, as the rotator cuff injury was found to be generalized and pre-existing, and the vaccine injury was thus not the predominant factor at play at the time of his surgery). While Petitioner's SIRVA may have slightly exacerbated his pain due to these comorbid conditions, compensation for the SIRVA and its associated pain and suffering *must* be calibrated downward. This is not a run-of-the-mill "surgery SIRVA," where a six-figure award for pain and suffering is appropriate – and Petitioner should not expect otherwise.

## Conclusion and Scheduling Order

Petitioner has presented sufficient proof to establish the six-month severity requirement. Section 11(c)(1)(D).

**Accordingly, by no later than <u>Wednesday, May 21, 2025</u>**, the parties shall file a joint status report concerning the status of Petitioner's damages demand and, if appropriate, stating whether and when Respondent would like to file an amended Rule 4(c) Report.

**IT IS SO ORDERED.**

<u>s/Brian H. Corcoran</u>
Brian H. Corcoran
Chief Special Master

---

[6] *Lang* also described a Health and Human Services-Centers for Disease Control joint study which found that rotator cuff tears were present in approximately 40% of a cohort of compensated SIRVA cases. *See* 2020 WL 7873272, at *13; *see also Grossman v. Sec'y of Health & Hum. Servs.,* No. 18-13V, 2022 WL 779666, at *17 (Fed. Cl. Spec. Mstr. Feb. 15, 2022) (citing the Atanasoff article relied upon in creating the SIRVA QAI, for the proposition that "MRI findings . . . such as rotator cuff tears, may have been present prior to vaccination and became symptomatic as a result of vaccination-associated synovial inflammation"); *accord* 42 C.F.R. § 100.3(c) (describing SIRVA as "an inflammatory reaction" within the musculoskeletal system of the shoulder).